NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-109
Consolidated with 22-110, 22-111, 22-112

STATE OF LOUISIANA

VERSUS

DARRIONE KENTRELL BELL

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 19-3539A
(consolidated with 19-3539B, 19-3539C, 19-3540)
HONORABLE JOHN C. REEVES, JUDGE

\*\*\*\*\*\*\*\*\*\*

CHARLES G. FITZGERALD
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, and John E. Conery and Charles
G. Fitzgerald, Judges.

CONVICTION AND SENTENCE AFFIRMED.

**Edward K. Bauman**
**Louisiana Appellate Project**
**P.O. Box 1641**
**Lake Charles, Louisiana 70602**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
        **Darrione Kentrell Bell**

**Bradley R. Burget**
**District Attorney**
**Joseph A. Boothe**
**Assistant District Attorney**
**4001 Carter Street, Suite 9**
**Vidalia, Louisiana 71373**
**(318) 336-5526**
**Counsel for Appellee:**
        **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Darrione Kentrell Bell, appeals his conviction and sentence for the first degree murder of Rosie Hooper.

## SUMMARY OF FACTS

Defendant was convicted of murdering three people. First, Rosie Hooper, an eighty-five-year-old woman, who was beaten and stabbed despite being bedridden. Second, her sixty-five-year-old son, Ellis Hooper, who was stabbed repeatedly in the neck while in bed. And third, Rosie's sixty-seven-year-old son, Johnny Hooper, who was found beaten and stabbed in the kitchen of their home.

Defendant was also convicted of the aggravated burglary of the home of Charles Lyles, a seventy-nine-year-old man who lived near the Hooper residence. Defendant entered Charles's home armed with a lead pipe. Defendant fled when Charles brandished a rifle.

## PROCEDURAL HISTORY

In February 2020, a grand jury indicted Defendant under La.R.S. 14:30 for the first degree murder of Rosie Hooper. The trial court docket number for this charge is 19-3539A. The grand jury simultaneously charged Defendant with two more counts of first degree murder for the intentional killing of Rosie's two sons, Johnny and Ellis. The trial court docket number for Johnny's murder is 19-3539B. And the docket number for Ellis's murder is 19-3539C. In addition, Defendant was indicted under La.R.S. 14:60 for aggravated burglary. The trial court docket number for this charge is 19-3540.

Seven months later, in September 2020, the State filed a motion to consolidate the three murder charges. That motion was immediately granted. Five weeks after that, Defendant filed a motion to suppress the blood evidence obtained during his

warrantless arrest. Two days later, the State filed a motion to consolidate the aggravated burglary charge with the murder charges. And a few days after that, a contradictory hearing was held on Defendant's motion to suppress and the State's second motion to consolidate. Defendant's motion was denied; the State's motion was granted.

Ultimately, on October 15, 2020, a twelve-person jury unanimously found Defendant guilty as charged on each count. Two weeks later, on October 28, 2020, the trial court sentenced Defendant to life imprisonment without benefit of probation, parole, or suspension of sentence for each murder. The trial court also imposed the maximum sentence of thirty years for the aggravated burglary. The sentences were ordered to run consecutively.

Thereafter, on December 17, 2020, Defendant filed a motion to reconsider sentence, which the trial court denied that same day. Defendant now appeals his conviction and sentence for the first degree murder of Rosie Hooper.[1] Defendant asserts three assignments of error:

1. The trial court erred in denying [Defendant's] Motion to Suppress any and all evidence seized as a result of the warrantless search of his home.

2. The trial court erred in not ordering a mental health evaluation of [Defendant] given the horrendous nature of the crimes and his erratic actions that night. At the very least, a Pre-Sentence Investigation Report should have been ordered, despite there being mandatary sentences.

3. Defense counsel was ineffective for failing to request a mental examination of [Defendant], for failing to request that a Pre-

---

[1] Defendant has also appealed his convictions and sentences for murdering Rosie's two sons, along with the conviction and sentence for aggravated burglary. Those appeals are addressed in three separate opinions. Specifically, our opinion in appellate docket number 22-110 reviews Defendant's conviction and sentence for the first degree murder of Johnny Hooper. Our opinion in appellate docket number 22-111 reviews Defendant's conviction and sentence for the first degree murder of Ellis Hooper. And our opinion in appellate docket number 22-112 reviews Defendant's conviction and sentence for aggravated burglary.

Sentence Investigation Report be prepared addressing any prior mental health treatment or crimes committed, and in failing to object to the admission of gruesome crime scene photos.

## LAW AND ANALYSIS

### I.     Errors Patent

In accordance with La.Code Crim.P. art. 920, we review appeals for errors patent on the face of the record.  After reviewing the record, we find no errors patent.

### II.    Defendant's First Assignment of Error

In his first assignment of error, Defendant contends that the trial court erred in denying his motion to suppress evidence obtained following his warrantless arrest. In denying the motion, the trial court found the existence of exigent circumstances and probable cause.  We now review this ruling under the abuse of discretion standard of review. *State v. Summers*, 15-1363 (La. 7/29/15), 170 So.3d 960.

The hearing on Defendant's motion to suppress was held on October 8, 2020. The State's first witness was Sergeant Christopher Goad, who is a patrol division shift supervisor with the Concordia Parish Sheriff's Office.  According to Sergeant Goad, he was dispatched to the Hooper residence located at 113 Weaver Road in Ferriday, Louisiana, in response to a female caller reporting to 911 that her mother was dead; the caller believed someone had killed her mother.  Upon arriving at the scene, Sergeant Goad recalled seeing two women crying by a ditch.  He then found the three Hooper victims inside their home.  All three appeared to have been beaten to death.

Sergeant Goad was then asked about Defendant's arrest.  In response, he explained that before he arrived at the scene, he was aware that Defendant was a suspect in an armed break-in just down the road.  But once on scene, he observed a large crowd of people gathering outside of the Hooper residence.  And "[s]ome of

the family members in the large crowd that had gathered had stated that [Defendant] lived, supposedly lived right across the street[.]"

According to Sergeant Goad, members of the crowd told the officers at the scene that if they (law enforcement) did not find Defendant, the crowd would, and that if they (law enforcement) shot Defendant, the crowd would not have to do it. Sergeant Goad then testified about Defendant's arrest, explaining:

> I believe Captain Cowan at the time and Deputy Walter Mackel knocked on the door [of 110 Weaver Road] first. Deputy Mackel hollered loudly he can see the gentleman in the living room. At that time, they knocked on the door once more, hollered, "Sheriff's Office. Open the door." The door was never opened. At that time, the door was forced open. Captain Cowan, Deputy Mackel, another deputy and myself, I went into there, and Mr. Darrione was in the living room.
>
> . . . .
>
> Due to the crowd outside continuing to holler for us to kill [Defendant], I had another on duty deputy there pull my unit into [Defendant's] driveway. I immediately put him in the backseat of my car, turned my lights and sirens on and tried to clear the crowd and got him out of there as quickly as we could.

Sergeant Goad reiterated that he did not feel Defendant was safe until he was removed from the scene. Sergeant Goad also noted that prior to entering the 110-Weaver-Road residence to arrest Defendant, he watched a surveillance video showing a man walking back and forth between the driveways of 113 Weaver Road (the Hooper residence) and 110 Weaver Road (the location of the arrest).

On cross-examination, Sergeant Goad testified that there were additional officers present beyond the four who entered 110 Weaver Road for the arrest. Sergeant Goad acknowledged that no warrant had been obtained prior to Defendant's arrest, and that he was unaware of any threats of Defendant fleeing or destroying evidence. But as to the crowd, Sergeant Goad further noted that members of the crowd had begun gathering at an opening in the fence that surrounded the 110-

4

Weaver-Road property.  Deputies, however, were able to push them back.  And this was happening before the arrest.

Sergeant Goad also recalled that there were between 150 and 200 people in the crowd, that people in the crowd were encouraging law enforcement to shoot Defendant, and that crowd members were yelling "[y]'all better get him before we do."  He also noted, however, that law enforcement did not see anyone armed in the crowd.

The State next called Major John Cowan, also with the Concordia Parish Sheriff's Department.  Major Cowan testified that prior to Defendant's arrest, he (Major Cowan) was aware that Defendant had been identified as the perpetrator of a home invasion that occurred on Weaver Road around the same time as the murders.  The homeowner was Charles Lyles.  According to Major Cowan, Charles's daughter, who was also inside the home, ended up chasing Defendant down Weaver Road.  And she stated that Defendant would be "in his old house trailer" located at 110 Weaver Road.

As to the growing crowd of people, Major Cowan testified that there were around forty people, all adults.  He described them as acting very aggressively.  When asked if he believed the crowd was a threat to Defendant's safety, Major Cowan answered, "[a]bsolutely."

Major Cowan acknowledged that law enforcement did not have confirmation of Defendant's location until they entered the trailer at 110 Weaver Road.  Defendant's arrest, as described by Major Cowan, occurred as follows:

> Once we got to the trailer, . . . [t]he front door was locked.  We used a hooving tool, which is like a pry bar with a hook on the end of it.  We was going to use it to pry the door and make entry.  As we were prying the door, [Defendant] stands up from behind just some random items that was in the living area that's when Mackel hollered at him to

5

show his hands. At that moment, we dropped the hooving tool, and as the door was closing, Mackel was saying that he would run towards the front of the house. So we surrounded the house. Once we got all areas surrounded, we breached the door, made entry, and I arrested [Defendant] in the living area on the floor.

Major Cowan clarified that before prying the door open, deputies announced, "Sheriff's Department. If you're in there, please come out." He then added that he did not feel Defendant was safe in the area. He also felt that Defendant might pose a danger to the community.

Major Cowan was then asked questions about the warrant process. In response, he testified that he was familiar with the process, noting that he typically filed for warrants for the sheriff's office prior to his promotion. He then estimated that it would have taken between an hour and a half and two hours to obtain an arrest warrant for Defendant. Major Cowan acknowledged that, to his knowledge, the crowd members were not armed, that there were no specific threats being made beyond the warnings that the crowd members would get Defendant if law enforcement did not, and that he had no specific knowledge that Defendant was attempting to flee or destroy evidence.

Major Cowan believed that there was probable cause for an immediate arrest of Defendant. He believed that removing Defendant from 110 Weaver Road was the most reasonable and prudent course of action. And he also believed that the crowd posed a danger to Defendant: Defendant was at risk of great bodily harm or death if he was not quickly removed.

The State then called Officer Phillip Smith, who is an investigator with the Concordia Parish Sheriff's Office. Officer Smith recalled that upon arriving at the scene, he was already aware that Defendant had been identified as the individual who had broken into Charles Lyles's home.

6

Officer Smith also described the crowd members as aggressive. He testified that people were hollering at law enforcement to "[k]ill [Defendant]." He believed that the crowd posed a threat to Defendant's safety, noting that deputies drove a car right up to the house to safely remove Defendant from the scene. Officer Smith explained that removing Defendant was the most prudent course of action, adding that "[o]nce the crowd was aware that he was there, they became [a] lot more verbal, a lot more agitated, and frankly, if they had wanted [Defendant], they could have taken him from us, because there was only about eight of us out there."

On cross-examination, Officer Smith acknowledged that he was not aware of anybody in the crowd being armed, that law enforcement had not pursued Defendant into the trailer at 110 Weaver Road, that there was no arrest warrant, and that there was nothing indicating that Defendant was actively destroying evidence. According to Officer Smith, the crowd included at least fifty people. Officer Smith reiterated that he did not believe that the officers at the scene could have stopped the crowd if its members had decided to become violent. Thus, in his opinion, exigent circumstances existed to justify the warrantless arrest of Defendant.

At the close of evidence, the trial court denied Defendant's motion to suppress. As the trial court put it: "I believe that the State met its burden here that exigent circumstances as well as probable cause existed for the fearful nature of what the crowd could have done to [Defendant] for his safety and everything, that the arrest had to be [e]ffected immediately."

Louisiana Code of Criminal Procedure Article 703 addresses the motion to suppress. Paragraph D of that article states:

> D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of

proving the admissibility of a confession or statement by the defendant or of any evidence seized without a warrant.

Turning now to our standard of review. As explained by the Louisiana Supreme Court in *Summers*, 170 So.3d at 966:

> "In reviewing the trial court's ruling on defendant's motion to suppress, this Court looks to the totality of the evidence presented at the motion to suppress hearing. . . ." *State v. Burkhalter*, 428 So.2d 449, 455 (La.1983). The purpose of this comprehensive review is to ascertain whether there has been an abuse of discretion. *State v. Montejo*, 06-1807, p. 21 (La. 5/11/10), 40 So.3d 952, 967.

Here, the only inconsistency between the testimony of the officers was the size of the crowd: Major Cowan and Officer Smith described the crowd as roughly forty to fifty people, while Sergeant Goad estimated the crowd was three to four times that size. Beyond that, the deputies all agreed that the crowd was significantly larger than the contingent of law enforcement on scene, and that the crowd was angry and making threats towards Defendant. And on that basis, the deputies all believed that Defendant was in danger.

In *State v. Fountain*, 49,637, p. 8 (La.App. 2 Cir. 3/4/15), 162 So.3d 652, 656-57, the second circuit addressed warrantless arrests with exigent circumstances, explaining:

> Warrantless entries into the home for arrest or seizure are invalid in the absence of exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *State v. Washington,* 2012–2203 (La.11/16/12), 104 So.3d 401. The United States Supreme Court has defined exigent circumstances as "a plausible claim of specially pressing or urgent law enforcement need." *Illinois v. McArthur,* 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). Exigent circumstances may arise from the need to prevent the offender's escape, to minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and to preserve evidence from destruction or concealment.

Defendant argues that law enforcement's concern about crowd control should have no bearing on the presence of exigent circumstances. We disagree. The issue

of whether law enforcement is able to prevent a crowd from attacking a suspect falls squarely into the category of "minimize[ing] the possibility of a violent confrontation which could cause injury to the officers and the public." *Id.* at 657. In the instant case, the trial court found that the officers were justified in executing a warrantless arrest due to exigent circumstances—the possibility of a violent confrontation between the crowd and Defendant.

Based on the record before us, the trial court did not abuse its discretion in denying Defendant's motion to suppress. Defendant's first assignment of error is thus without merit.

## III. Defendant's Second Assignment of Error

In his second assignment of error, Defendant contends that "[t]he trial court erred in not ordering a mental health evaluation of [Defendant] or at the very least a Pre-Sentence Investigation Report so as to provide some insight as to [Defendant]'s mental and criminal background."

Under La.Code Crim.P. art. 643, "The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed." Article 643 was interpreted in *State v. Barnett*, 18-254, 27-28 (La.App. 5 Cir. 4/3/19), 267 So.3d 209. There, the fifth circuit explained:

> The trial judge is required to order a mental examination of the defendant only when he has a reasonable ground to doubt the defendant's mental capacity to proceed. La. C.Cr.P. art. 643; *State v. Pugh*, 02-171 (La. App. 5 Cir. 10/16/02), 831 So.2d 341, 349. Reasonable grounds to doubt the defendant's mental capacity to proceed refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant cannot understand the proceedings, appreciate the significance of the proceedings, or rationally aid his attorney in his defense. *State v. Williams*, 02-1016 (La. App. 5 Cir. 2/25/03), 841 So.2d 936, 942, *writ denied*, 03-2205 (La. 8/20/04), 882 So.2d 571. The ordering of a sanity commission rests in the sound discretion of the trial court. *State v. Fish*, 99-1280

> (La. App. 5 Cir. 4/12/00), 759 So.2d 937, 939. The trial court's denial of a motion for appointment of a sanity commission will be reversed only for abuse of discretion. *State v. Pollard*, 12-346 (La. App. 5 Cir. 12/18/12), 106 So.3d 1194, 1199, *writ denied*, 13-0140 (La. 6/21/13), 118 So.3d 408.

*Id*. at 229.

In essence, Defendant here argues that two things should have alerted the trial court that Defendant lacked the mental capacity to proceed. First, Defendant points to the testimony of Danny White. And second, Defendant seems to assert that the very nature of the murders should have alerted the trial court as to his lack of mental capacity. We disagree.

At trial, Danny White testified that on the night of the murders, Defendant entered his (Danny's) bar carrying a beer bottle which he held on to all night. Danny recalled that his nephew and Defendant were shirtless dancing with two women. In fact, they were the only ones left in the bar. Danny described Defendant as generally behaving childishly. In our view, this testimony creates the inference that Defendant was drunk rather than mentally incapable of proceeding with trial.

As to the gruesome nature of the murders, many crimes—particularly murder and rape—involve inexplicable acts of brutality. But that alone does not mean that the person who committed the criminal act is unable to aid in his own defense.

In this case, the record does not reflect any reasonable ground to doubt Defendant's mental capacity to proceed, especially considering that defense counsel never moved for a sanity commission or competency hearing and never argued the defense of insanity. Thus, the trial court did not abuse its discretion in this respect.

Now to Defendant's contention that the trial court erred in failing to order a presentence investigation. A presentence investigation under La.Code Crim.P. art. 875(A)(1) is within the discretion of the trial court. *State v. Bell*, 12-195 (La.App. 3

Cir. 6/6/12), 91 So.3d 1279, *writ denied*, 12-2363 (La. 3/15/13), 109 So.3d 380. And the trial court's failure to order a presentence investigation will not be disturbed absent an abuse of that discretion. *State v. Hayden*, 98–2768 (La.App. 4 Cir. 5/17/00), 767 So.2d 732.

Here, Defendant's three convictions for first degree murder each carried a mandatory life sentence. Thus, the trial court did not abuse its discretion in not ordering a presentence investigation.

For the above reasons, Defendant's second assignment of error is without merit.

## IV.    Defendant's Third Assignment of Error

In his final assignment, Defendant asserts that his trial counsel was ineffective for failing to request a mental examination and for not objecting to the crime-scene photographs being admitted into evidence.

At the outset, we note that an ineffective-assistance-of-counsel claim is more appropriately addressed in an application for post-conviction relief. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. This is especially true when the claim is based on evidence not in the record. *State v. Kendrick*, 96-1636 (La.App. 3 Cir. 6/25/97), 699 So.2d 424, *writ denied*, 98-2159 (La. 12/18/98), 731 So.2d 280.

Defendant here continues to bemoan counsel's failure to seek an examination of his prior mental health treatment. Yet the record does not contain any information regarding prior mental health treatment. Without that information, we cannot properly review whether counsel was ineffective for failing to seek a mental examination. For this reason, relegation of this issue to post-conviction relief will

allow the trial court the opportunity to fully develop a record regarding whether Defendant had prior mental health issues that should have been raised in his defense.

Now to the crime-scene photographs. Because the record contains sufficient evidence concerning this matter, we will exercise our discretion and review Defendant's claim that his trial counsel was ineffective for not objecting to the admission of these photographs.

In assessing a claim of ineffectiveness of counsel, the defendant must show two things: (1) that his attorney's performance was deficient, and (2) that the deficiency prejudiced his defense. *Strickland v. Washington,* 104 S.Ct. 2052 (1984). Both elements must be shown by Defendant. *State v. Serigny,* 610 So.2d 857, 860 (La.App. 1 Cir.1992), *writ denied,* 614 So.2d 1263 (La.1993).

As to the second element, the error is prejudicial if it was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 104 S.Ct. at 2064. In other words, the defendant must demonstrate that but for counsel's deficient conduct, the proceeding would have resulted in a different outcome. *State v. Felder,* 00-2887 (La.App. 1 Cir. 9/28/01), 809 So.2d 360, *writ denied,* 01-3027 (La. 10/25/02), 827 So.2d 1173.

The supreme court reviewed the issue of gruesome photographs in *State v. Broaden*, 99-2124, pp. 22-24 (La. 2/21/01), 780 So.2d 349, 364, *cert. denied*, 122 S.Ct. 192 (2001):

> Defendant complains of the admission of three gruesome photographs. Defendant argues that as both victims would have died from bullets fired by Adams, the probative value of this evidence is slight and was introduced solely to inflame jurors and incite them to convict based on the pictures. Objections were raised before trial.
>
> The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as

well as location and placement of wounds and to provide positive identification of the victim. *State v. Koon*, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; *State v. Martin*, 93–0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. *Koon*, 96-1208 at p. 34, 704 So.2d at 776, citing *State v. Perry*, 502 So.2d 543, 558–59 (La.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).

We agree that the photographs are indeed gruesome. This court regularly sees claims of "gruesome" photographs in capital cases, but has reversed only once on these grounds in any case. *State v. Morris*, 245 La. 175, 157 So.2d 728 (1963) (gratuitous introduction of "gruesome and ghastly" photographs depicting the progress of an autopsy in an "increasing grotesque and revolting" manner constituted reversible error when the defendant admitted that he killed the victim and contested only his state of mind). Admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." *Martin*, 93-0285 at pp. 14-15, 645 So.2d at 198. *Cf., State v. Wessinger*, 98-1234, pp 16-17 (La.5/28/99), 736 So.2d 162, 179 (photographic evidence "will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict defendant absent other sufficient evidence.")

We do not find any reason to treat photographic evidence differently than any other evidence, which is admissible if relevant and more probative than prejudicial. La.Code Evid. art. 403. At any rate, we find that the admission of the disputed photographs in this case was gratuitous. The pathologist could have given verbatim testimony illustrated by other, less graphic photos. While the state is certainly entitled to the moral force of its evidence, that evidence should enlighten rather than bludgeon the jury. The photographs taken at the crime scenes were sufficient to demonstrate the cause of death as well as the location of the gunshot wounds. However, we do not find reversible error.

Here, Defendant provides no argument to support his contention that the probative value of the crime-scene photographs was substantially outweighed by the danger of unfair prejudice. La.Code Evid. arts. 401, 403. On the contrary, he merely puts forth the conclusory statement that "[s]uch gruesome photographs were not necessary for the State to prove their case and could only inflame the jury, thus they should have been objected to." Remember, Defendant was accused of murdering

three elderly individuals, one of whom was bedridden. And he did so by stabbing and beating them to death. In this light, it is hard to imagine crime-scene photographs not being gruesome.

In the end, Defendant failed to show that his trial counsel's performance was deficient. But even if Defendant had made that showing, there is nothing in the record to suggest that the outcome of trial would have been different. In other words, even without the photographs, the evidence connecting Defendant to the murders includes the blood of the victims on Defendant's person and clothing, along with a videotape of Defendant entering the Hooper residence.

In sum, Defendant failed to show either element of his deficiency-of-counsel claim. His third assignment of error is thus without merit.

### DISPOSITION

For the above reasons, Darrione Kentrell Bell's conviction and sentence are affirmed for the first degree murder of Rosie Hooper.

**CONVICTION AND SENTENCE AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules, Courts of Appeal, Rule 2-16.3