WILLIAMS, J.
hThe defendant, Kendrick D. Fountain, was charged by bill of information with possession of a Schedule I controlled dangerous substance (marijuana) with intent to distribute, a violation of LSA-R.S. 40:966, possession of a Schedule IV controlled dangerous substance (Xanax) with intent to distribute, a violation of LSA-R.S. 40:969, and possession of a firearm by a convicted felon, a violation of LSA-R.S. 14:95.1.[1] Pursuant to a plea agreement, the defendant pled guilty to possession of Xa-nax. In exchange for the defendant’s guilty plea, the state agreed that the defendant would receive a sentence of five years at hard labor. The state also agreed not to file a habitual offender bill of information and to dismiss the other charges. Thereafter, the defendant was sentenced to serve five years at hard labor. For the following reasons, we affirm.
FACTS
On January 29, 2014, Officer Brady Att-away, of the Winnfield Police Department, received a call in reference to loud music coming from an older model green vehicle on Clay Street in Winn Parish; Officer *654 Attaway responded to the call. As he approached the vehicle, he recognized the driver as Fernando Deloach (a/k/a “JJ Rainwater”). Deloach, who had multiple active felony warrants for his arrest, fled when Officer Attaway attempted to arrest him. The officer chased Deloach until he ran into the-rear entrance of a house located- at 127 Clay Street. Fearing for his safety, Officer Attaway went around to the front of the house, sought shelter behind |2a white Crown Victoria vehicle parked in front of the house, and called for backup. While waiting for his fellow police officers to arrive, Officer Attaway watched as the defendant opened the front door of the house and looked out for approximately 30 seconds. Officer Attaway stated that he recognized the defendant; he had been informed by the defendant’s probation officer that the defendant also had outstanding felony warrants for his arrest. Officer Attaway further testified that the sheriffs office confirmed that the defendant had active felony warrants for his arrest. Based on this knowledge, the officer yelled out to the defendant, who immediately slammed and locked the door. However, while the defendant had the door open, Officer Attaway testified that he saw De-loach standing inside the residence near the back door.
Sgt. Terrance Triplet and two other police officers responded to the call to the scene. Sgt. Triplet assisted Officer Atta-way in obtaining entry through the front door. When the officers entered the home, Officer Attaway went into the first bedroom on the right and found the defendant hiding under the bed. Subsequently, the defendant came from underneath the bed and was arrested. The officer then asked the defendant if anyone else was in the house; the defendant responded, “No.” Officer Attaway requested consent to search the house to locate Deloach. According to the officer, the defendant responded, “Man I don’t have sh* * in here. Go ahead [and] search.” While searching for Deloach in a bedroom in the back of the house, Officer Attaway noticed a large hole in the floor with a bag containing a green leafy substance sticking out of the hole, but did not ^investigate further. After the police officers failed to find Deloach inside the house, Officer Attaway asked the defendant if he could search for any illegal items Deloach may have left behind. The defendant agreed, repeating two additional times, “You can search my house. I do not have anything in' here.” When Officer Attaway asked whether Deloach could have left illegal items in the house, the defendant repeated that Deloach had not been in his house.
The defendant was then taken outside to Officer Attaway’s police cruiser to wait with another police officer while the search was conducted. In the bedroom where the defendant had been hiding, Officer Atta-way saw a cigarette pack sitting on top of a cabinet, along with a set of scales. He opened the pack and found “twenty or ten” twenty-dollar bills and approximately fifteen white oblong pills, which were later identified as Xanax. Officer Attaway then searched the back bedroom and found a .38 caliber revolver under a mattress, a backpack with “some baggies, [and] some weighing scales with suspected marijuana residue on them.” Officer Attaway also secured the green leafy substance he had seen earlier on the floor; the substance was later identified as marijuana. Thereafter, Officer Attaway proceeded to the kitchen, where he had seen Deloach standing earlier. He opened the refrigerator and discovered a 9mm Hi-point firearm inside; he then opened the microwave oven and found a loaded magazine.
The defendant was placed under arrest and charged with the following offenses: (1) possession with intent to distribute *655 marijuana; (2) possession with intent to distribute Xanax; and (3) possession of a firearm 14by a convicted felon.
On March 27, 2014, the defendant filed a motion to suppress, alleging that the search of his residence was illegal because it was conducted without a warrant and without his consent. Alternatively, the defendant argued that police officers exceeded their authority in carrying out a protective sweep or search incident to arrest by searching dressers, backpacks, a cigarette pack, a refrigerator, and under mattresses.
On April 23, 2014, a hearing was conducted on the defendant’s motion to suppress.[2] Officer Attaway testified to the facts as outlined above. Additionally, on cross-examination, the officer explained that when he and Sgt. Triplet entered the house, they saw a woman holding a baby sitting on the bed where the defendant was hiding. Officer Attaway also testified that he saw two fresh sets of footprints in the snow: one leading to the back door of the house, and the other leading away from the house. Additionally, the officer admitted that the guns and marijuana were not found in the bedroom in which the defendant had been apprehended.
Kursten Casper also testified at the hearing. She testified as follows: she, the defendant, and her friend’s baby were in the defendant’s bedroom when the police officers entered the house; the defendant and his cousin, Jarvis Lowe, had only been living at the residence for two days; the defendant occupied the front bedroom of the house and Lowe occupied the back bedroom; she knew Deloach; she did not see or hear Deloach enter the house on the night in question; she would have known if Deloach had Centered the house; two police officers entered the house; she was sitting on the defendant’s bed when the officers entered; the defendant hid under the bed; she does not recall whether the officers asked for consent to search the house; after the officers found the defendant under the bed, they escorted him into the living room and placed him in handcuffs; by that time, one of the officers had already picked up the cigarette pack and found the money inside; thereafter, the officer began “searching the whole room;” the officers proceeded to search the rest of the house. Casper also stated, “I don’t recall [the officer] asking for permission on anything. I don’t recall him asking for permission to come in the house[.]” On cross-examination, Casper admitted that she did not know what the defendant told the officers because most of her attention was focused on the baby.
The defendant testified as follows: he and Lowe moved into the house at 127 Clay Street approximately two days before the incident; he saw Officer Attaway stop Deloach’s vehicle; Deloach jumped out of the vehicle and fled behind some houses; Deloach did not come inside his house; he told Officer Attaway that Deloach was not in his house; he led the officer through the house to show him that Deloach was not there; he pointed out to Officer Attaway that there was not any melted snow in the house to indicate that Deloach had entered the residence through the back door; the police officers “kicked in” his door, entered the house, and pulled him from under his bed; the officer informed him that they were going to place him in handcuffs but the officer stated that he was not under arrest; the officers began to search the house; .he asked the officer, “Why [are] you searching | fimy house without a search warrant?”; the officer did not ask for consent to search the house; he did not con *656 sent to the search. On cross-examination; the defendant admitted that he hid under the bed because he knew there was an outstanding warrant for his arrest.
Following the defendant’s testimony, the trial court denied the motion to suppress. In its oral reasons, the court noted as follows: the defendant could not have seen where Deloach had run; Officer Attaway testified that Deloach ran to the rear of the defendant’s house; Officer Attaway saw Deloach standing inside the defendant’s house when the defendant opened the door to look out; at that point, Officer Attaway knew both men had warrants for their arrest and he had the right to forcibly enter the house to apprehend them; when he entered the house, the officer found the defendant hiding under the bed; the officer placed the defendant under arrest; while canvassing the rest of the house, the officer saw the marijuana in plain view; thereafter, the officer asked the defendant for consent to search the house for any illegal items Deloach might have left in the house; Officer Attaway testified that the defendant consented three times to a search of the house. The court concluded that the resulting search was not illegal.
On June 23, 2014, pursuant to an agreement with the state, the defendant plead guilty to an amended charge of possession of Xanax; the other charges were dismissed.[3] The parties agreed that the de^ fendant would serve five years at hard labor, and that the state would not bill him as a |7habitual offender. However, the defendant specifically reserved his right to appeal the trial court’s ruling denying his motion to suppress pursuant to State v. Crosby, 338 So.2d 584 (La.1976). After waiving sentencing delays, the trial court sentenced the defendant to serve five years at hard labor.
The defendant now appeals.
DISCUSSION ’
The defendant contends the trial court erred in denying his motion to suppress. He argues that the state failed to carry its burden of proving the legality of the search.
When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. LSA-C.Cr.P. art. 703(D); State v. Freeman, 44,980 (La.App.2d Cir.1/27/10), 33 So.3d 222, writ denied, 2010-0535 (La.10/1/10), 45 So.3d 1094. A trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Roberson, 46,697 (La.App.2d Cir.12/14/11), 81 So.3d 911, writ denied, 2012-0086 (La.4/20/12), 85 So.3d 1270; State v. Whitehead, 42,677 (La.App.2d Cir.4/2/08), 980 So.2d 243, writ denied, 2008-1096 (La.1/9/09), 998 So.2d 713. An appellate court reviews a trial court’s ruling on a motion to suppress under the manifest error standard in regard to factual determinations, as well as credibility and weight determinations, while ^applying a de novo review to findings • of law. State v. Freeman, supra.
Warrantless entries into the home for arrest or seizure are invalid in the absence of- exigent circumstances. Payton v. New York, 445 U.S. 573, 100 *657 S.Ct. 1371, 63 L.Ed.2d 639 (1980); State v. Washington, 2012-2203 (La.11/16/12), 104 So.3d 401. The United States Supreme Court has defined exigent circumstances as “a plausible claim of specially pressing or urgent law enforcement need.” Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). Exigent circumstances may arise from the need to prevent the offender’s escape, to minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and to preserve evidence from destruction or concealment. State v. Brisban, 2000-3437 (La.2/26/02), 809 So.2d 923.
In the instant case, it is undisputed that both the defendant and Deloach had outstanding felony warrants for their arrest.’ Officer Attaway testified that he entered the defendant’s residence in hot pursuit of Deloach. The officer testified that he had witnessed Deloach run into the back entrance of the defendant’s home and he remained outside of the residence to ensure that Deloach did not escape. While waiting for backup, Officer Attaway saw the defendant and knew that the defendant had warrants for his arrest; he also saw Deloach standing inside of the defendant’s home. Based on these facts, we find that the trial court was not manifestly erroneous in concluding that the police officers’ entry into the residence, in hot pursuit of a criminal suspect, did not violate the constitution. Accordingly, we turn our attention to the search of the premises.
| flIt is well settled that a warrant-less search conducted pursuant to valid consent is permitted by the federal and state constitutions. State v. Raheem, 464 So.2d 293 (La.1985); State v. Lara, 46,639 (La.App.2d Cir.11/2/11), 78 So.3d 159. Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. U.S. v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); State v. Lara, supra.
The state bears the burden of proving that consent was given freely and voluntarily. State v. Lara, supra; State v. Banks, 43,710 (La.App.2d Cir.12/3/08), 999 So.2d 808, writ denied, 2009-0151 (La.10/16/09), 19 So.3d 471. Voluntariness is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case. The factual determinations of the trial judge are entitled to great weight on appellate review. State v. Ossey, 446 So.2d 280 (La.1984); State v. Delvalle, 46,563 (La.App.2d Cir.9/21/11), 73 So.3d 1026.
Officer Attaway testified that once he entered the defendant’s home, he arrested the defendant and then searched the home, looking for Deloach. While doing so, the officer saw marijuana on the floor in plain view. Thereafter, he asked the defendant for his consent to search the house. The officer testified that the defendant verbally consented to the search. Subsequently, pursuant to the defendant’s consent, Officer Attaway discovered the Xanax, scales and weapons. We note that the defendant and Casper testified that the defendant did not authorize the search. However, the trial court had the opportunity to observe the tone and demeanor of the | inwitnesses; the trial court clearly believed Officer Att-away’s testimony. The trial court’s factual and credibility determinations are entitled to great weight on appeal. Therefore, we find that the trial court did not err in concluding that the state met its burden of proving that the search of the residence without a search warrant was lawful. This assignment is without merit.
CONCLUSION
For the aforementioned reasons, the defendant’s conviction and sentence are hereby affirmed.
*658 CONVICTION AFFIRMED; SENTENCE AFFIRMED.

. The original bill of information indicated that Xanax was a Schedule III CDS; however, the state later amended the bill, in open court, to charge the defendant with simple possession of a Schedule IV CDS ("Xanax”).

. The preliminary examination was also conducted during the hearing, although the standard rules of evidence applicable to a motion to suppress were observed.

. The defendant also agreed to the revocation of his probation in another matter; he was ordered to serve the previously imposed ten-year hard labor sentence consecutively to his newly imposed five-year sentence.