Judgment rendered January 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,200-KW

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                               Plaintiff-Respondent

versus

TERRY E. MCCALL                                  Defendant-Applicant

* * * * *

On Application for Writs from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 390,023

Honorable Ramona L. Emanuel, Judge

* * * * *

GILMER & GIGLIO, LLC                             Counsel for Applicant
By: Katherine E. Gilmer
    Sarah Russell Giglio

JAMES E. STEWART, SR.                            Counsel for Respondent
District Attorney

FERNANDO B. GRIDER, JR.
Assistant District Attorney

* * * * *

Before COX, ROBINSON, and HUNTER, JJ.

**COX, J**.

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. Terry McCall was charged with one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1, and one count of illegal possession of stolen firearms, in violation of La. R.S. 14:69.1. For the following reasons, we reverse the trial court's denial of the motion to suppress.

**FACTS**

According to Shreveport Police Department ("SPD") Corporal J.M. Bassett's ("Cpl. Bassett") report and affidavit, on June 24, 2022, while on patrol, he and Sergeant Steve McKenna ("Sgt. McKenna") were advised that two black men who "had previously committed aggravated assault with a firearm" were in a silver Range Rover, were "on scene" at a Valero gas station on 4000 Lakeshore Drive, and were "armed with a handgun."

While en route, officers observed two men in a vehicle matching the caller's description leave the gas station and pull into a nearby apartment complex. After officers stopped the men, they identified McCall as the driver, who told officers he "wasn't involved in any aggravated assaults," and that he did not have a firearm on his person. McCall "eventually" told officers he had a firearm in his apartment and gave verbal consent to search his vehicle and apartment. Although no weapon was recovered from the vehicle, McCall showed Sgt. McKenna where the firearm was located.

McCall was then *Mirandized* and told officers he purchased the firearm from a friend several years ago and that he had not been convicted of a felony. Because officers could not "corroborate or refute" McCall's statements, he was released; however, the firearm from McCall's apartment

was seized. Cpl. Bassett's report indicated that on June 27, 2022, three days after the encounter with McCall, he ran a criminal background check on McCall and discovered he had a "lengthy criminal history," which included a felony narcotics offense in 2016, that prohibited him from possessing a firearm. The report also provided that the firearm recovered from McCall's apartment was reported stolen on February 27, 2022, from Haughton, Louisiana.

McCall was subsequently arrested on June 30, 2022, and on July 26, 2022, was charged with one count of possession of a firearm by a convicted felon, and one count of illegal possession of a stolen firearm. McCall filed a motion to suppress on November 23, 2022; the hearing commenced on January 11, 2023. During the hearing, the following pertinent testimony was given:[1]

Cpl. Bassett testified that he generated the report for this case as the lead investigator. Cpl. Bassett explained that he was trained to include all relevant information in his reports, including full names of individuals involved, phone numbers, and addresses. Cpl. Bassett then stated that the report for this case was generated at 10:30 a.m. on June 24, 2022.

Cpl. Bassett testified that while he and Sgt. McKenna were on patrol that day, Sgt. McKenna received a call from a concerned citizen that "two black males in a silver Range Rover on the scene at the Valero [on] 4000

---

[1] Stephanie Hardwick ("Hardwick"), the Administrative Assistant for the SPD Records Division, testified that this division is responsible for providing copies of records if requested. In reviewing a copy of dispatch records, Hardwick confirmed that the report was generated on June 14, 2022, at 10:30, and that the record reflected that the event location was "4223 Lakeshore Drive at Live Apartments," and that the event comment provided "has stolen GLC-BNX839, one subject in custody with the gun." Hardwick further testified that in response to the defense's request to supply 911 calls and dispatch records regarding an aggravated assault between "June 24th and 30th of last year," no records were found.

2

Lakeshore, who had previously committed an aggravated assault with a firearm and were armed with a handgun." Cpl. Bassett admitted that he was unsure whether the call was received on Sgt. McKenna's personal or work-issued cell phone and the caller's number and name were not recorded. Cpl. Bassett further admitted that although he never spoke with the caller or heard the conversation between the caller and Sgt. McKenna, he documented the information as it was relayed to him. Cpl. Bassett explained that according to Sgt. McKenna, the two men had previously pointed a gun at the caller, but the incident did not occur at the Valero where the caller reported the men were. Cpl. Bassett admitted that the caller was never identified and he was unsure where and when the reported incident occurred.

Cpl. Bassett then stated that while en route to the reported location, he and Sgt. McKenna saw two men in a silver Range Rover driving from the direction of the Valero. Cpl. Bassett testified that he lost sight of the vehicle for "less than a minute" before he and Sgt. McKenna located the vehicle again as it pulled into the parking lot of the Live Apartment complex, which was located near the gas station. Cpl. Bassett explained that by the time he and Sgt. McKenna pulled into the parking lot, the men had already exited the vehicle. Cpl. Bassett stated that the passenger was halfway up a stairwell, but McCall stood by the vehicle.

Cpl. Bassett stated that he detained and conducted a pat-down search of the passenger and while he did not personally observe it, he assumed Sgt. McKenna searched McCall. Cpl. Bassett stated that no firearm was found on the passenger and Sgt. McKenna did not report that a firearm was recovered from McCall. Cpl. Bassett further testified that McCall's vehicle and the surrounding area, where the firearm could have been discarded, were

3

also searched, but no firearm was found. Cpl. Bassett then admitted that during that time, he did not have probable cause to arrest McCall for the reported aggravated assault. Cpl. Bassett further testified that while he was not present for the conversation, Sgt. McKenna advised him that McCall eventually admitted that he had a firearm in his apartment.

According to Cpl. Basset, after the encounter, he did not continue to investigate the aggravated assault or attempt to locate the caller who reported the offense. Cpl. Bassett stated that he also wrote the affidavit used in support of the arrest warrant. He explained that the affidavit was based on the narrative he wrote for this case. However, he had no additional information regarding the aggravated assault, and that McCall was arrested for illegal possession of a stolen firearm and possession of a firearm by a convicted felon.

On cross-examination, Cpl. Bassett clarified that the reports generated for this case did not reference additional information about the aggravated assault because McCall was not arrested for that offense. Therefore, he only included information about the incident surrounding the arrest for the firearm. Cpl. Bassett stated that it is common for officers to investigate one crime and then discover another throughout the course of the investigation. Cpl. Bassett stated that in this case, while investigating the aggravated assault, he discovered that McCall was a convicted felon in possession of a stolen firearm.

Cpl. Bassett explained that McCall consented to a search of his vehicle and apartment, and showed officers where his firearm was located. Cpl. Bassett stated that after he *Mirandized* McCall, McCall informed officers that he purchased the firearm from a friend for $400 four years ago.

4

McCall also informed officers that he had never been convicted of any felony charges. Cpl. Bassett explained that, at the time, he was unable to verify this information, but later discovered that the firearm was stolen and that McCall had a "very lengthy criminal history."

On redirect, Cpl. Bassett testified that he and Sgt. McKenna detained McCall and his passenger because they matched the description of the reported men, and that he and Sgt. McKenna searched McCall and his passenger to determine if there was a firearm to corroborate the reported offense. Cpl. Bassett admitted no firearm was discovered on either man, or within the vehicle, and that the only place any firearm was found was in McCall's apartment. Cpl. Bassett further admitted that neither McCall nor his passenger could have gone into the apartment before either he or Sgt. McKenna stopped them.

Cpl. Bassett then reviewed Defense Exhibit 1, an SPD Background Event Chronology ("Chronology"). Cpl. Bassett explained that the Chronology "is stuff that dispatch-the information dispatch is receiving and they're imputing into the event chronology." Cpl. Bassett further explained that "[w]e verify if the firearm was stolen or not and run it on the info channel and it came back stolen." Cpl. Bassett then acknowledged that the "EVENT UPDATED" within the Chronology provided that at 10:23 a.m., on June 24, 2022, at the Live Apartments provided the following comment: "[h]as a stolen GLC."[2] Cpl. Bassett testified that this information meant that on June 24, 2022, someone provided information that McCall had a stolen firearm.

---

[2] Cpl. Bassett clarified that GLC referred to a Glock.

5

Next Sgt. McKenna testified that on June 24, 2022, he conducted follow-up investigations in the Mooretown area of Shreveport when he received a call from an anonymous concerned citizen that a "firearm [was] pointed at another subject there around [sic] the Queensborough area." Sgt. McKenna stated that the caller reported that the offense previously occurred in an "alleyway around the Queensborough area, maybe, around Lillian Street." Sgt. McKenna testified that the anonymous caller reported that it had followed the two men in the "gray Range Rover" to the Valero gas station at 4000 Lakeshore Drive. Sgt. McKenna stated that while en route, Cpl. Bassett saw a vehicle matching the anonymous caller's description but lost sight of the vehicle for a moment. Sgt. McKenna stated that he had to turn around and that Cpl. Bassett saw the vehicle pull into the Live Apartment complex. Sgt. McKenna stated that when he and Cpl. Bassett pulled into the parking lot, they stopped the men, and advised McCall of the situation.

Sgt. McKenna then clarified that he was unsure if the anonymous caller contacted him on his personal or work-issued cell phone. He explained that he did not document the caller's number and did not know any other identifying information about the caller. Sgt. McKenna stated that he was unsure whether the caller provided him with the license plate number of the vehicle it followed, but the type of vehicle involved was not "real common" in this area. Sgt. McKenna reiterated that when he came in contact with McCall, he likely conducted a pat-down search given the nature of the call; but, no firearm was discovered on McCall or the passenger. Sgt. McKenna also testified that he received verbal consent to search the vehicle as well, but no firearm was recovered in the vehicle either.

6

Sgt. McKenna testified that neither McCall nor his passenger was arrested for aggravated assault and that no further investigation was made into the reported offense. Sgt. McKenna testified that only the anonymous caller reported the offense, and no victim called about the offense.

On cross-examination, Sgt. McKenna testified that a warrant was issued for McCall for possession of a firearm by a convicted felon and for possession of a stolen firearm, and the arrest stemmed from the investigation into the reported aggravated assault. Sgt. McKenna also testified that "once the investigation was done involving that," McCall "could have left at any point in time because now it went to a consensual contact [sic] which led to us getting verbal consent from him." Sgt. McKenna stated that despite this, McCall subsequently consented to a search of the vehicle and apartment, and directed him to where the firearm was located.

On redirect, Sgt. McKenna testified that he and Cpl. Bassett were the only officers present when they first stopped McCall, but that approximately three to five other officers arrived later. Sgt. McKenna testified that he was not sure if the other officers were armed, but that they could have been.

At the conclusion of testimony, the trial court denied McCall's motion to suppress. In doing so, the trial court provided: "Based on the totality of the evidence adduced, the Court denies the motion to suppress. The Court does not find that the motion is supported by law or evidence."

**DISCUSSION**

On appeal, McCall presents a sole assignment of error, which is bifurcated into two arguments before this Court addressing the legality of his detention.

7

First, McCall argues that his detention was unlawful under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and La. C. Cr. P. art. 215.1, in part, because there was insufficient evidence to show that Sgt. McKenna received a phone call from an anonymous citizen, and he basis of the investigation was merely a fabricated pretext to initiate the stop.

In support, McCall highlights that no record of the anonymous call exists on either Sgt. McKenna's personal or work-issued cell phone; there was no evidence that anyone reported an aggravated assault to dispatch despite testimony that the anonymous caller reported the offense; and that neither Sgt. McKenna or Cpl. Bassett took any further steps to investigate the offense or identify the victim. McCall further notes that although Cpl. Bassett testified that Sgt. McKenna received a call, he did not speak with the caller nor did he hear the conversation to corroborate the information from the call.

The Ssssstate bears the burden of proving the admissibility of the evidence seized without a warrant when the legality of a search or seizure is placed at issue by a motion to suppress evidence. La. C. Cr. P. art. 703(D). The trial court's ruling on a motion to suppress is afforded great weight and will not be disturbed unless a preponderance of the evidence favors suppression. *State v. Manning*, 51,450 (La. App. 2 Cir. 8/9/17), 244 So. 3d 600, *writ denied*, 17-1575 (La. 5/18/18), 242 So. 3d. 575. The trial court's ruling is reviewed under a manifest error standard regarding factual determinations, as well as credibility and weight determination, and this Court applies a *de novo* review to findings of law. *State v. Bell-Brayboy*, 53,413 (La. App. 2 Cir. 3/4/20), 310 So. 3d 252, *writ denied*, 20-01061 (La. 12/8/20), 306 So. 3d 427.

8

Here, Sgt. McKenna testified that while on patrol with Cpl. Bassett, he received an anonymous call from a concerned citizen. According to his testimony, the anonymous caller reported that two black men in a silver Range Rover were at the Valero gas station at 4000 Lakeshore Drive. The caller indicated that the two men "previously" committed aggravated assault and were armed. Admittedly, Cpl. Bassett testified that he did not hear the conversation; however, he confirmed that Sgt. McKenna received a phone call, and from that call, relayed the aforementioned information to him. Cpl. Bassett also testified that based on this information, the pair went to the reported area and saw two men in a silver Range Rover as indicated by the anonymous caller.

Here, we find that there is no evidence that Sgt. McKenna potentially fabricated that he received an anonymous call or that Cpl. Bassett was equally complicit in falsifying the information provided by the anonymous caller. Therefore, we cannot say the trial court erred in finding that officers received an anonymous call regarding an aggravated assault.

Alternatively, McCall argues that even if this Court should find that the anonymous call occurred, there was insufficient information from the call to justify the stop. McCall argues that the only information officers received from the anonymous caller was that two black men in a silver Range Rover at the Valero gas station allegedly committed aggravated assault and were armed. McCall notes that although the crux of the call concerned a report about an aggravated assault, Sgt. McKenna failed to ask the anonymous caller for any further information, including the license plate number of the Range Rover the caller allegedly reported it followed to the

9

gas station; any identifying information about the victim; or the date, time, and location of the offense.

Accordingly, McCall contends that the investigation of an alleged aggravated assault that occurred at an unknown time and date, or victim, without more, was insufficient to justify the detention; therefore, any evidence seized as a result of the stop should be suppressed.

The right of every person to be secure in his person, house, papers, and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the Louisiana Constitution. U.S.C.A. Const. Amend. 4. *See also*, La. Const. art. I, § 5. Law enforcement officers have the right to stop and interrogate one reasonably suspected of criminal conduct, and this right is recognized by both state and federal law. *See* La. C. Cr. P. art. 215.1; *Terry v. Ohio*, *supra*.

The standard required for an investigative detention is "reasonable suspicion of criminal activity" supported by articulable facts that criminal activity "may be afoot" as articulated in *Terry v. Ohio, supra*. *State v. Brown*, 47,247 (La. App. 2 Cir. 9/26/12), 105 So. 3d 734. In reviewing the legality of an investigatory stop, courts must consider the totality of the circumstances of each case to determine whether the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. *United States v. Sokolow,* 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989), *citing Terry v. Ohio, supra*; *State v. Brown*, *supra*. Courts must also give deference to the inferences and deductions of a trained police officer. *State v. Huntley*, 97-0965 (La. 3/13/98), 708 So. 2d 1048.

10

In applying the totality of the circumstances test, several factors must be considered, including the location and time of the stop, as well as the defendant's actions preceding the stop. Although an individual's presence in a "high-crime area" alone is insufficient to support reasonable suspicion of criminal activity, a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation. *State v. Brown*, *supra*. The United States Supreme Court has also recognized that nervous, evasive behavior is also a pertinent factor in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Further, the Louisiana Supreme Court has also "expressly held or at least implied that the defendant's flight from police officers is the most important factor in the totality of the circumstances analysis." *State v. Morgan*, 09-2352 (La. 3/15/11), 59 So. 3d 403.

An anonymous tip may also provide the basis for an investigatory stop. *Alabama v. White,* 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). However, anonymous tips are generally less reliable than tips from known informants and can only form the basis for reasonable suspicion if accompanied by specific indicia of reliability. *Florida v. J.L.,* 529 U.S. 266, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000)*, citing Alabama v. White, supra.* Therefore, a tip can provide reasonable suspicion for an investigatory stop if it accurately predicts future conduct in sufficient detail to support a reasonable belief that the informant had reliable information regarding the suspect's illegal activity. *State v. Gates*, 13-1422 (La. 5/7/14), 145 So. 3d 288.

An anonymous caller's ability to predict a suspect's future behavior goes toward reliability, as it demonstrates inside information and a special familiarity with the suspect's affairs. *State v. Lane*, 09-179 (La. App. 5 Cir. 9/29/09), 24 So. 3d 920, 925, *writ denied*, 09-2360 (La. 5/21/10), 36 So. 3d 226. Predictive ability is not always necessary, and a non-predictive tip coupled with police corroboration or independent police observation of suspicious activity can provide the police with the requisite reasonable suspicion to detain a suspect. *Id.*; *Alabama v. White*, *supra*. However, neither reasonable suspicion nor probable cause exists by corroborating merely descriptive, non-predictive information. *Florida v. J.L., supra; State v. Brown, supra.*

In *Florida v. J.L., supra*, officers received an anonymous call that a young black male, wearing a plaid shirt, was standing at a particular bus stop carrying a gun. Officers were dispatched to the location where they observed three black men standing at the bus stop, including the defendant, who was wearing a plaid shirt. Although the officers did not see a firearm or observe unusual or suspicious behavior, they immediately approached the defendant, ordered him to put his hands up, frisked him, and seized the gun from his pocket. The Florida Supreme Court found that the search was unlawful and the evidence seized should be suppressed under the Fourth Amendment.

In affirming the ruling, the United States Supreme Court held that an anonymous tip that a person carrying a gun is not, without more information, sufficient to justify a police officer's stop and frisk of that person. The Court stated:

[T]he officers' suspicion that J.L. was carrying a weapon arose not from their own observations but solely from a call made from an unknown location by an unknown caller. The tip lacked sufficient indicia of reliability to provide reasonable suspicion to make a *Terry* stop: It provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. The contentions of Florida and the United States as amicus that the tip was reliable because it accurately described J.L.'s visible attributes misapprehend the reliability needed for a tip to justify a *Terry* stop. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

. . .

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: [i]t will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.

In contrast, in *Navarette v. California*, 572 U.S. 393, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014),[3] the Supreme Court ruled that an anonymous tip provided officers with reasonable suspicion to stop the defendant. Officers received information from an anonymous 911 caller[4] that she had been "[run]. . . off the roadway." The caller provided officers with information about the truck, including make and license plate number. After locating the truck, officers detected the smell of marijuana, and a search of the truck bed revealed 30 pounds of marijuana, which was ultimately seized. The trial

---

[3] Similarly, our sister court from the First Circuit in *State v. Barras*, 09-0014 (La. App. 1 Cir. 6/19/09), 20 So. 3d 1100, 1105, *writ denied*, 09-1660 (La. 6/4/10), 38 So. 3d 292, found that officers had reasonable suspicion, in part, to justify the stop of the defendant where an anonymous caller reported "the in-time movement of the suspected driver which also included identification of the vehicle being driven by make, model, color, and license plate number."

[4] Although the caller who provided the tip identified herself, the lower courts treated the caller as if she was anonymous because neither the caller nor the 911 operator who took the call was present at the suppression hearing.

court and court of appeal denied the defendant's motion to suppress, and the California Supreme Court denied review.

On appeal, the Supreme Court addressed whether officers lacked reasonable suspicion of criminal activity to justify the stop based solely on information supplied by the caller. In upholding the trial court's ruling, the Court reasoned that several factors reflected that the call, even assuming that it was anonymous, bore a sufficient indicium of reliability. Of significance, the Court noted that "[b]y reporting that she had been run off the road" and describing the make and model of the truck and the truck's license plate, the caller claimed eyewitness knowledge of the offense in question, which supported the caller's reliability.

The Court also found that the proximity in time between when the call was made and when officers located the truck "negate[d] the likelihood of deliberate or conscious misrepresentation" and supported the reliability of the information because it suggested that the incident was reported soon after it occurred. Moreover, the Court found that the caller's use of the 911 emergency system further proved the tip's reliability, noting that the system has features that allow callers to be recorded, and later identified and traced, providing some safeguards against false reports.

Although the Court found this case to be a close call, it concluded that the tip created reasonable suspicion of an ongoing crime, rather than an isolated episode of past recklessness, and that the relevant circumstances, taken together, justified the officer's reliance on the reported information.

In addition to the United States Supreme Court, the Louisiana Supreme Court has also considered whether an anonymous tip can be a valid basis for an investigatory stop.

14

In *State v. Robertson*, 97-2960 (La. 10/20/98), 721 So. 2d 1268, the Court found that officers lacked reasonable suspicion to stop the defendant based on information provided by an anonymous caller. The anonymous caller provided the defendant's name, physical description, location, description of the defendant's vehicle, and that the defendant was involved in the sale of narcotics. Officers were dispatched to the location and observed a vehicle that matched the description and followed it.

When the defendant stopped and exited the vehicle, officers stopped and informed the defendant he was under investigation for selling drugs. A canine unit was called to the scene, and after the dog alerted there was a presence of drugs in the vehicle, officers searched the vehicle and found a plastic bag with drugs in it. On review, the Court stated:

> In the instant case, it is true that the officers were able to corroborate certain aspects of the anonymous tip, including defendant's name, his physical description[,] and the location of the described vehicle. The tip, however, contained no predictive information from which the officers could reasonably determine that the informant had "inside information" or a "special familiarity" with the defendant's affairs.
> . . .
> In the absence of any suspicious conduct or corroboration of information from which police could conclude that the anonymous informant's allegation of criminal activity was reliable, we must conclude that there was no reasonable suspicion to detain defendant.

In contrast, in *State v. Thompson*, 02-0333 (La. 4/9/03), 842 So. 2d 330, the Louisiana Supreme Court found officers had reasonable suspicion to detain and seize evidence. Here, officers received information from an "untested confidential informant" who reported that the defendant was selling drugs from his home. The untested informant provided officers with a name, address, description of the defendant's vehicle, and license plate. Officers established surveillance of the address and observed the defendant

15

remove a white object from his pocket and place the object on the driver's side floorboard of the vehicle.

The defendant re-entered the residence and emerged with a toddler, whom he placed in the backseat. An unknown man approached the defendant and the pair moved further down the sidewalk where officers observed the men exchange money before the defendant went back to his vehicle, removed an object from the floor, and gave it to the unknown man. The defendant drove from the area and met with another unknown man. When the defendant spotted the officers, he put "something in his mouth," and fled on foot. Before officers detained him, the defendant threw something into his car, which officers seized and discovered that the object was a tin foil with heroin in it.

In upholding the trial court's ruling in denying the motion to suppress, the Court stated:

> Although the tip provided the impetus for establishing the surveillance, the officers clearly did not stop the defendant based on this information alone. Indeed, the officers directly observed a hand to hand transaction indicative of a narcotics sale: the defendant received money in exchange for an object he brought from his residence; the unknown male with whom he made the transaction had just arrived and then left immediately after the transaction; and lastly, the unknown male suspiciously put something into his mouth before fleeing from approaching officers.
>
> . . .
>
> Accordingly, we hold that these activities, particularly when coupled with the tip that the defendant sold large amounts of heroin, gave police more than a sufficient basis to stop the defendant.

After a thorough review of the record in consideration of the totality of the circumstances, we cannot say that the record in this case reflects that the officers had reasonable suspicion to justify the investigatory stop.

16

At the outset, we note that there was an absence of evidence to support the anonymous caller's veracity, credibility, and basis of knowledge. In *Navarette*, *supra*, the Court found that the caller's reliability was further enhanced, in part, because the in-time offense was reported through the 911 emergency system, which allowed for the caller to be later identified. Here, Sgt. McKenna testified that he could not remember if the anonymous caller contacted him on his personal or work-issued cell phone. The caller's number was never documented and Sgt. McKenna testified he had no other information about the caller, the caller never called him back, and no victim was identified. Further, there were no dispatch records regarding an alleged aggravated assault despite testimony that the caller reported the offense to dispatch services.

Moreover, the caller only provided that two black men in a silver Range Rover, who had previously committed aggravated assault, were at the Valero gas station at 4000 Lakeshore Drive and were armed. Although vague, officers were able to corroborate the caller's descriptive identification. However, while this information may be reliable in identifying a determinate person, reasonable suspicion does not exist "by corroborating merely descriptive, non-predictive information." *Florida v. J.L.*, *supra*.

Here, there was no corroborated predictive information regarding McCall's future movements or conduct for officers to test the caller's knowledge or credibility. The caller simply provided that the two men "previously" committed aggravated assault with a firearm and possessed a handgun. However, the caller did not specify, and testimony did not clarify *when* the reported aggravated assault occurred. Without more, the

information is arguably too general for officers to rely on because the offense could have occurred at any given time, including mere minutes before officers received the call, to several weeks, months, or even years prior.

Moreover, even in the absence of predictive information, the caller did not report that the two men, at the time of the call, were engaged in any criminal conduct. In particular, the caller reported that the two men had a handgun, but did not report that the men either unlawfully possessed the weapon or that the weapon was recently used to commit an offense, only that the men "previously" pointed a gun at them. As the Court in *Florida v. J.L.*, *supra*, stated, "[a]n anonymous tip that a person carrying a gun is not without more, sufficient to justify a police officer's stop and risk of that person." Further, the anonymous tip should suggest "more than an isolated episode of past recklessness." *Navarette*, *supra*.

This Court acknowledges, however, that corroborated predictive information, while significant, is not a dispositive factor in considering the totality of the circumstances of any given case. So that even in the absence of non-predictive information, officers may have reasonable suspicion to execute an investigatory stop if independent observation of criminal or suspicious activity existed. *Alabama v. White*, *supra*; *Thompson*, *supra*.

In the instant case, the only observable conduct officers witnessed was that McCall drove from the gas station to the Live Apartment complex. Neither officer testified that they witnessed McCall commit a traffic violation, let alone engage in any other observable criminal conduct during the drive or when they first contacted the men in the parking lot. Further, there was no evidence that McCall or his passenger engaged in any kind of

evasive conduct such as an attempt to flee or disobey orders to stop. Additionally, there was no testimony or evidence that either man appeared to be nervous or made any furtive, suspicious, or threatening movements during the detention that would raise suspicion.

Therefore, we cannot say that the information from the anonymous tip provided officers with reasonable suspicion to justify the investigatory stop.

However, McCall told officers he owned a firearm and gave permission to search not only his vehicle but his apartment where a firearm was discovered and seized. Therefore, the inquiry before this Court is whether McCall's consent was sufficiently attenuated to dissipate the taint from the unlawful stop and frisk.

It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and U.S. Constitutions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Bates*, 51,890 (La. App. 2 Cir. 2/28/18), 246 So. 3d 672. To be valid, consent must be (1) free and voluntary, in circumstances that indicate the consent was not the product of coercion, threat, promise, pressure, or duress that would negate the voluntariness; and (2) given by someone with apparent authority to grant consent, such that the police officer reasonably believes the person has the authority to grant and consent to the search. *Bates*, *supra*.

Additionally, a valid consent will also rehabilitate a prior warrantless search. *Id.* But if consent was obtained after an illegal detention, intrusion, or entry, the consent is valid only if it was the product of free will and not the result of an exploitation of the previous illegality. Among the factors to consider in determining whether the consent was sufficiently attenuated

19

from the unlawful conduct to be a product of free will are: (1) whether the police officers adequately informed the individual that he need not comply with the request, (2) the temporal proximity of the illegality and the consent, (3) the presence of intervening circumstances and, particularly, (4) the purpose and flagrancy of the official misconduct. *Id.*; *State v. Owen*, 453 So. 2d 1202 (La. 1984).

In matters where the question of consent is an issue, the trial court's determination concerning the facts and circumstances surrounding each case is entitled to great weight upon review. *State v. Banks,* 43,710 (La. App. 2 Cir. 12/3/08), 999 So. 2d 808, *writ denied*, 09-0151 (La. 10/16/09), 19 So. 3d 471; *State v. Fountain*, 49,637 (La. App. 2 Cir. 3/4/15), 162 So. 3d 652.

In the instant case, the trial court, in denying the motion to suppress, summarily provided that, "[b]ased on the totality of the evidence adduced, the Court denies the motion to suppress. The Court does not find that the motion is supported by law or evidence," without assigning reasons for its ruling. However, the only testimony regarding McCall's consent was from Sgt. McKenna, who simply stated that "once the investigation was done involving that," McCall "could have left at any point in time because now it went to a consensual contact [sic] which led to us getting verbal consent from him."

Although Cpl. Bassett's report reflected that McCall "eventually" told officers he had a firearm in his apartment, and gave consent, Cpl. Bassett ultimately admitted that he was not present when consent was given and that he only documented what Sgt. McKenna told him. Further, while Cpl. Bassett testified that Sgt. McKenna's body camera was on during that time, no copy of the body camera footage was submitted on the record to support

20

this finding. Moreover, while Cpl. Bassett's report indicates that McCall "eventually" told officers he had a firearm and gave consent, there is no evidence to reflect the length of the detention in relation to when the consent was given. Finally, the record does not disclose when the "three to five" other officers arrived, or if they were present when McCall gave consent.

In light of the limited facts and evidence surrounding McCall's consent, as well as the totality of the circumstances surrounding the detention itself, we cannot say that the State met its burden in providing sufficient evidence to find that McCall's consent was valid.

In the interest of thoroughness in our *de novo* review of the record, we write to further address the seizure of the firearm discussed during the hearing.

The record reflects that after McCall showed officers where the firearm was located in his apartment, he informed officers that he bought the firearm from a friend four years ago for about $400. McCall also told officers that he had not been convicted of any felonies. Thereafter, officers seized the firearm and placed it into the SPD property room. Cpl. Bassett testified that on June 27, 2022, three days *after* the encounter, he reviewed McCall's criminal background and discovered McCall had a "very lengthy criminal history," which consisted of a felony narcotics offense. Cpl. Bassett also discovered that the recovered firearm had been reported stolen. An arrest warrant was then issued and McCall was arrested.

The plain view doctrine renders a warrantless search reasonable: (1) if the police officer is lawfully in the place from which he views the object; (2) where the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object. *State v. Miguel*, 18-

0711 (La. 1/30/19), 263 So. 3d 873. The "immediately apparent" aspect of the plain view exception is better stated as probable cause to believe the item in question is or contains contraband. *Id.*, *citing*, *Texas v. Brown*, 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983).

The Fourth Amendment's inception was designed not only to protect against unlawful searches but unlawful *seizures* as well. Here, it is clear that even if McCall's consent to search his apartment was valid, officers' subsequent seizure of the firearm was unlawful. Here, at the moment officers approached McCall and were informed he had a firearm in his apartment, they did not have any knowledge that McCall was a convicted felon, and no criminal background check was conducted to verify this information.

Moreover, upon being directed to the firearm's location, officers testified that they did not know whether the firearm was stolen or if McCall lawfully owned it. As the record reflects, the officers were only told that McCall purchased the firearm from a friend and that he had not been convicted of any felonies. As admitted during the hearing, officers lacked probable cause to arrest McCall for the reported aggravated assault; nevertheless, officers seized the firearm, and *three* days after the seizure, conducted a criminal background check and discovered McCall was a convicted felon. Without further verification, nothing about the nature of the firearm or McCall's possession of the firearm was immediately apparent that it was contraband that could be lawfully seized.

We note that the officers in this matter could have conducted a criminal background check on McCall or alternatively, written down the firearm's serial number and then checked the numbers at a later time. When

the officers discovered that McCall was a convicted felon and that the firearm had been reported stolen, they could have applied for an arrest warrant to address the matter.

Accordingly, we reverse the trial court's denial of the motion to suppress.

## CONCLUSION

For the aforementioned reasons assigned herein, the judgment on the motion to suppress is reversed, and the motion is granted.

**WRIT GRANTED; JUDGMENT REVERSED.**